Good morning, Your Honor. Good morning. Thomas Roach appearing on behalf of Judith Harris, Plaintiff and Appellant. Your Honors, this is a Social Security disability case. This is one that's a little out of the ordinary. This is a case where there was actual rehabilitation services that the claimant participated in, not a workers' compensation situation, but one where, after she sustained her stroke, she actually engaged in this herself. This is a 50-year-old woman with a 32-year work history that suffers a stroke, then two years later suffers a heart condition that requires an angioplasty and the placement of two stents, and then a year later requires yet another angiogram. After the stroke, she participated in the Sharp Rehabilitation Services, Sharp Hospital Rehabilitation Services, and they did a 10-day work evaluation. And this wasn't just any 10-day work evaluation. They actually placed her back in her employer's workplace, and the Sharp Rehab Services came in and observed her 10 consecutive days. And at the end of those 10 days, they found that, as a result of her impairments, she was not competitively employable. She was having trouble concentrating. She was having extreme trouble with fatigue. She just was not able to keep up with the work. Now, this was in 1995, wasn't it? Yes, sir. Fairly early in the recovery process when that evaluation was done. It was. The first one was, yes, your honor. But she then later, after the end of that 10-day evaluation, they suggested that she try volunteer work to get her back up to speed. So, a year later, she does, in fact, reemploy Sharp Rehab and goes through a volunteer program. So, yes, the first one was close in time to the stroke, but the second rehab program was a year later. Once again, they found that she wasn't competitively employable. But she doesn't give up. She goes back to Sharp Rehab yet a third time and has them find her a job where she can work at home, work at her own pace, and even at that, she finds that she can't keep up with the work. She can't produce enough work to make herself of value to that employer. Now, Sharp Rehab, their counselor, wrote an evaluation, and in this evaluation, wrote two evaluations, actually, that came to the conclusion that she wasn't competitively employable. The ALJ discounted this evaluation for a number of reasons, but his first reason that he discounted the evaluation was it wasn't done by a doctor. Well, the fact of the matter is it's not offered as medical evidence. It's offered as vocational evidence by professionals who do this for a living for the purpose of getting people back to work. So the fact that it wasn't offered by a doctor isn't a legitimate reason to dismiss the value of the report itself. Second, the judge rejects it because he says it's contradicted by the opinions of three of the doctors in the record. One of the doctors was a consultative doctor that Social Security sent her to examine her one time, okay? One of the other doctors was a neurologist that she went to on her own for treatment of her post-stroke symptoms. And the third doctor was the medical expert that testified at the hearing. Well, none of these doctors saw her in the work environment. So their opinions are merely estimates of what she can do based on her medical records. But unfortunately, objective medical records are not directly transferable to the ability to do work. In other words, you can't look at an x-ray and go, oh, from this x-ray, I can tell she can only stand four hours. But isn't that ultimately the decision of the administrative law judge in a case like this? If I recall correctly, of those three physicians, none of the physicians, including hers, found that she was disabled. Am I misquoting that? I don't want to. But my impression was that there was no medical doctor who sustained a finding of disability. None of them actually said she was disabled. But Dr. Lasker's opinion does not directly contradict the Vocational Rehabilitation Service's opinion. Dr. Lasker was concerned because she had reduced mobility in her dominant hand, her right hand. He also found that her fatigue was clearly likely to be a result of the stroke and the combination of the diabetes. And he said that, let me see if I can find it, that even though she might be able to perform her old work, it may put her at a somewhat competitive disadvantage in the workplace. Well, clearly, that's exactly what the Sharp Rehabilitation Services say. They don't say that she's physically incapable of doing her work. They saw her there for a 10-day work study. She was doing the work, but she wasn't doing it at a competitive level. She was too slow. She was making too many mistakes. She just was not up to the work that she was doing before. So actually, although Dr. Lasker does not say she's disabled, he does say that she's not going to be able to do it competitively, which is actually consistent with the Sharp Rehab. Now, additionally, the judge — I think you said that it should be at a competitive disadvantage. Correct, Your Honor. Put her at a somewhat competitive disadvantage in the workplace. And that is our point. That's what Sharp Rehab says. She's at such a disadvantage that nobody's going to keep her. Her old employer will keep her. Well, there's a difference between the two. One, being at a disadvantage, and the other, being not able to do it. True, but it's not as if he was saying that she could go back to work. He's saying that if she does go back to work, she's going to be at a competitive disadvantage. Now, additionally, the judge rejected it because it was based largely on a short period of time and in a remote period of time. But as I pointed out earlier, the first one was shortly after the stroke, but it certainly wasn't a short period of time. It was 10 days. The next one, a year later, was a three-month work program. So that clearly wasn't a short period of time either, and it wasn't that remote. And the remoteness really has nothing to do with it if the residuals continue, and the residuals do continue. When was the first 10-day observation? Was that – I have something in my notes about four months. Was that right, four months after the stroke? Yes, Your Honor. The stroke was in February, and the 10-day observation was in June of 1994, so effectively it was four months later. So finally, the judge's reasons for rejecting this just aren't legitimate reasons. This is clearly something that Social Security feels that the judge is supposed to consider when he does his residual functional capacity assessment. It's written into their Social Security ruling 96-8P, okay? It says he's supposed to consider work evaluations if available. And this is one of the few cases where it was, in fact, available, and he rejected it without legitimate reasons. And as a consequence, he then found that she was capable of not just work, but he found that she was capable of going back to the actual work that the vocational rehabilitation specialists say that she couldn't do. I'd like to reserve anything left to do about it. All right, thanks. Good morning, Your Honor. My name is John Cusker, and I am the Assistant Regional Counsel representing Appellee Joanne Barnhart, Commissioner of Social Security. Opposing counsel is correct. We have an unusual situation here in that we have competing expert opinions regarding the claimant's ability to work. His contention that the ALJ didn't properly consider Ms. Houghton Duggan, the sharp expert's opinion, however, is belied by the fact that the ALJ articulated a number of reasons for not accepting that opinion. I'll point out, first of all, that the statement that the claimant wasn't suitable for competitive employment is a, a statement, an opinion that goes to the ultimate issue of disability, which both the Commissioner's regulations and this Court in Niman v. Hecker recognized are not entitled to any special weight. The ALJ did, however, evaluate these opinions and correctly concluded that the sharp expert's opinion was contradicted by the opinions of several medical doctors about what claimant could do. I would also point out something which I did not address in my brief, which is the basis for the opinion from Sharp, which was based on the claimant's ability to do what appears to me to have been her former mailroom job. Whereas, in fact, the opinion evidence that the ALJ relied upon here, which was offered by the vocational expert at the ALJ hearing, was that the claimant could perform her past work as an auction clerk, also known as an office clerk. That job, as the claimant admitted in her testimony at the hearing, required quite a bit less physical activity than the mailroom clerk job did. And that was the job that the ALJ found the claimant could perform, and it provided the basis for the ALJ finding that she was not disabled. Where was that, the second one that the ALJ relied on, was that with the current employee, her most current employer, or someone before? Her most current work was as a mail clerk. And that was what Sharp appears to have been testing initially, was her ability to perform that kind of work, moving mail around, for example. The auction clerk job required, as the claimant admitted in her testimony, activities that were completely consistent with what Dr. Grant Anderson, the medical expert, opined was her residual functional capacity. So there's no conflict there. When had she done that work? She had done that work as recently as 1987, which fell within the 15-year guideline, let's say, for finding that that was past relevant work. So we would submit that the ALJ did properly consider the competing opinion, offered a legitimate reason for rejecting it that was supported by substantial evidence, and adopted instead the competing opinion by the medical, the vocational expert at the ALJ hearing, which opinion was supported by substantial evidence, and that no more was required. Did the vocational expert see her doing any work, or was this just on the records? The vocational expert did not see the claimant performing any work. So her, the vocational expert's testimony was based upon what the doctor said her abilities were, right? That's correct. But, of course, I would like to reiterate that it appears the people at Sharp did not see the claimant performing any work. They saw her attempting to do other types of work. And as time goes on, it appears. I guess I don't know. What is an auction clerk? That's an odd title. The claimant actually describes this in her testimony, beginning at page 48 of the excerpts of record. She worked at a furniture auction, antiques, that kind of thing, she says. Oh, I see. A clerk at an auction, I see. That's correct. Do you wish to hear more? No, that's it. The second point I would like to address is the ALJ's findings respecting the claimant's credibility. The claimant contends that the ALJ didn't properly address the credibility issues under the law of this circuit. But, in fact, the ALJ did everything that was required by this Court's holding, Bunnell v. Sullivan, an en banc decision. The ALJ considered all the factors that are set forth in Bunnell and, in addition, the ALJ, excuse me, in addition, the ALJ properly evaluated the case in a manner consistent with this Court's holding in Thomas. There were conflicts between what the claimant said she can do and between what the medical evidence suggested she could do. There was also evidence that the claimant had, in fact, recovered from her 1994 stroke within a relatively short period of time. Some of the symptoms that she alleged as a consequence of that stroke had resolved before she completed vocational rehab at the hospital. The medical expert testifying at the hearing stated that, in fact, her heart condition was not that bad, and he discussed at great length what the medical findings respecting her heart condition were. In light of all this evidence, the ALJ's findings that the claimant's subjective complaints lacked credibility were legally adequate, notwithstanding the gloss that some panels have put on what ALJs must find. Bunnell never stated that ALJs must believe testimony unless there is affirmative evidence of glingering. That language simply cannot be found in that case. And then... I guess my question is one that Chisuko raised earlier. The closeness in time of the 10-day observation to the actual stroke of, say, four months. And when in relationship to that were the doctor's examinations? Quite a bit after, or? Well, I believe Dr. Lasker, his report is dated October 1995, which is relatively close in time to that 1994 stroke. And certainly the testimony by Dr. Grant Anderson at the 2000 hearing is much more remote. I was thinking that maybe if the argument is that she had improved quite a bit from the initial stroke and that 10-day observation, if she had improved a lot, is that what the doctors were finding? Or when was their examination in relationship to that 10-day observation? Well, I think Dr. Tamari saw the claimant in 1997, so that would have been somewhat later than that. Of course, the claimant's condition is fluctuating somewhat. The cerebrovascular accident in 1994 was, I think the medical expert testified, not a very significant CVA. Subsequently, she had what sounded like, well, what were invasive procedures, in fact. She had angioplasty. But her recovery from those procedures in was complete and not prolonged. Unfortunately for this claimant, and I must emphasize this too, her insured status for disability expired in March 1999, and her condition subsequently deteriorated. Unfortunately, any subsequent change in the claimant's condition after the date last insured is not really The ALJ's decision was supported by substantial evidence that it was legally correct and that the Court should affirm it. All right. Thank you, counsel. Thank you, Your Honors. In terms of the work evaluations, the second of the two work evaluations, which was three months in length, which occurred between November of 94 and February of 95, was a general clerical job. So even if the first 10-day evaluation was, in fact, an evaluation of her ability to return to her work as a male clerk, the second evaluation, which led to the same conclusion that she wasn't competitively employable, was an evaluation of a general clerical job. Her job as an office-slash-auction clerk was, in fact, that, a general clerical job. In fact, the ALJ and the vocational witness went back and forth because they had trouble with, you know, what is an auction clerk, and the V.E. explained to the ALJ that it basically is a clerical job. And so the opinion of Ms. Houghton Duggan is still supported, whether it be from the 10-day evaluation or whether it be from the three-month evaluation. She still was found not to be able to do those jobs. What was the — I understand the 10-day evaluation was daily. What was the three-month evaluation? What were they doing? The three-month evaluation was also daily, but her hours increased from one hour a day from the 10-day evaluation to three hours a day in the three-month evaluation. They tried to see if they could increase her tolerance, and they kicked her up to four hours a day. And when they kicked her up to four hours a day, they found that she was missing one day a week of work. So it was clearly beyond her tolerance. But even at three hours a day, she still wasn't able to sustain the work at a competitive level. And finally, I do want to clarify the comment made about the medical expert's testimony in the stroke. The medical expert did testify about the heart condition, but she never testified that the stroke was not a significant stroke. Okay? There's no evidence in the record that there wasn't a significant stroke or that she doesn't have the residuals from it that seemed to be keeping her from working and that kept her from competitively participating in the rehabilitation. One follow-up question. Dr. Betty Grant Anderson, and I'm reading from page five of the ALJ's opinion, opined that the claimant was capable of performing a limited range of light work activity based upon her impairments prior to her last date insured. I assume that that came later than these work evaluations that you're referencing. Correct. Yes. But Dr. Grant Anderson in her testimony didn't address the work evaluations, and the ALJ didn't ask her any questions about the work evaluations. And so it just went. So in essence, we have the opinion on the record without a lot of fact material to support it? Correct. Thank you, Your Honor. All right. Thank you, Counsel. The case is adjourned.
judges: Hug, Wardlaw, Suko